No. 22-40328

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

CONSUMERS' RESEARCH; BY TWO, L.P.,

*Plaintiffs-Appellees*,

v.

CONSUMER PRODUCT SAFETY COMMISSION,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Eastern District of Texas (Kernodle, J.)

---

## RESPONSE BRIEF FOR APPELLEES

---

J. Benjamin Aguiñaga
JONES DAY
2727 N. Harwood St.
Dallas, TX 75201
(214) 220-3939
jbaguinaga@jonesday.com

Donald F. McGahn II
Brett A. Shumate
John M. Gore
Anthony J. Dick
Brinton Lucas
Joseph P. Falvey
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
(202) 879-3939
bshumate@jonesday.com

*Counsel for Appellees Consumers' Research and By Two, L.P.*

# CERTIFICATE OF INTERESTED PERSONS

*Consumers' Research; By Two, L.P. v. Consumer Product Safety*

*Commission*, No. 22-40328

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. Plaintiff-Appellee **Consumers' Research**, which has no parent corporation. No publicly held company owns 10% or more of its stock.

2. Plaintiff-Appellee **By Two, L.P.**, which has no parent corporation. No publicly held company owns 10% or more of its stock.

3. Defendant-Appellant **Consumer Product Safety Commission**.

4. The following law firms and counsel have participated in the case, either in the district court or on appeal:

J. Benjamin Aguiñaga
JONES DAY
2727 N. Harwood St.
Dallas, TX 75201
(214) 220-3939
jbaguinaga@jonesday.com

Donald F. McGahn II
Brett A. Shumate
John M. Gore
Anthony J. Dick
Brinton Lucas
Joseph P. Falvey
JONES DAY
51 Louisiana Ave., N.W.

i

Washington, DC 20001
(202) 879-3939
bshumate@jonesday.com

*Counsel for Appellees Consumers' Research and By Two, L.P.*

Brian M. Boynton
Christopher R. Hall
Chetan A. Patil
Rebecca Cutri-Kohart
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883
Ben Franklin Station
Washington, D.C. 20044

James W. Harlow
U.S. Department of Justice
Civil Division, Consumer Protection Branch
P.O. Box No. 386
Washington, D.C. 20044

Mark B. Stern
Joshua M. Salzman
Daniel Aguilar
Amanda L. Mundell
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

*Counsel for Appellant Consumer Product Safety Commission*

*/s/ Brett A. Shumate*
Brett A. Shumate
*Counsel for Appellees Consumers'*
*Research and By Two, L.P.*

## STATEMENT REGARDING ORAL ARGUMENT

Consumers' Research and By Two, L.P. request oral argument. This case raises important questions about an ongoing violation of the Constitution's separation of powers. Oral argument would materially assist the Court in resolving these questions.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS..........................................i

STATEMENT REGARDING ORAL ARGUMENT.................................iv

TABLE OF AUTHORITIES....................................................vi

INTRODUCTION ...............................................................1

JURISDICTIONAL STATEMENT .........................................4

STATEMENT OF THE ISSUES.................................................4

STATEMENT OF THE CASE ..................................................5

    A.   The Consumer Product Safety Commission..............................5

    B.   This Lawsuit .........................................................8

SUMMARY OF THE ARGUMENT .........................................14

STANDARD OF REVIEW....................................................16

ARGUMENT.................................................................17

I.   CONGRESS'S LIMIT ON THE PRESIDENT'S ABILITY TO REMOVE
THE COMMISSIONERS VIOLATES THE SEPARATION OF POWERS ...........17

    A.   The Commission's Structure Defies the Constitution .............17

    B.   The Government's Contrary Arguments Are Meritless...........21

II.  THE DISTRICT COURT ISSUED APPROPRIATE RELIEF .........................34

    A.   Plaintiffs Have Standing To Seek Declaratory Relief .............34

    B.   Partial Final Judgment Was Proper........................................50

CONCLUSION .................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bowsher v. Synar,*
478 U.S. 714 (1986) ............................................................. 40

*Brackeen v. Haaland,*
994 F.3d 249 (5th Cir. 2021) (en banc) ............................... 16

*Buckley v. Valeo,*
424 U.S. 1 (1976) ................................................................. 19

*California v. Texas,*
141 S. Ct. 2104 (2021) .............................................. 2, 53, 54

*CFPB v. Seila Law LLC,*
923 F.3d 980 (9th Cir. 2019) ............................................... 45

*Chevron, U.S.A., Inc. v. NRDC,*
467 U.S. 837 (1984) ............................................................. 20

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ............................................................. 20

*Cochran v. SEC,*
20 F.4th 194 (5th Cir. 2021) (en banc) ......................... *passim*

*Cold Metal Process Co. v. United Eng'g & Foundry Co.,*
351 U.S. 445 (1956) ............................................................. 64

*Collins v. Mnuchin,*
938 F.3d 553 (5th Cir. 2019) (en banc) ................... 25, 39, 41

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ................................................. *passim*

*Contender Farms, L.L.P. v. USDA,*
779 F.3d 258 (5th Cir. 2015) ............................................... 42

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
543 U.S. 157 (2004) ............................................................. 26

*Eldredge v. Martin Marietta Corp.,*
207 F.3d 737 (5th Cir. 2000) ....................................... *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ex parte Levitt,*
    302 U.S 633 (1937) ................................................................ 44

*Exela Enter. Sols., Inc. v. NLRB,*
    32 F.4th 436 (5th Cir. 2022) ............................................... 33

*FEC v. Akins,*
    524 U.S. 11 (1998) ................................................................ 43

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) ..................................................... *passim*

*H & W Indus., Inc. v. Formosa Plastics Corp., USA,*
    860 F.2d 172 (5th Cir. 1988) ............................................... 55

*Hall v. Louisiana,*
    884 F.3d 546 (5th Cir. 2018) ............................................... 32

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ..................................................... *passim*

*Jackson v. USPS,*
    799 F.2d 1018 (5th Cir. 1986) ............................................. 63

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ............................................... 33

*Johnson v. Ocwen Loan Servicing, LLC,*
    916 F.3d 505 (5th Cir. 2019) ............................................... 53

*Liberty Mut. Ins. Co. v. Wetzel,*
    424 U.S. 737 (1976) ....................................... 59, 60, 61, 62

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................. 43

*Morrison v. Olson,*
    487 U.S. 654 (1988) ....................................... 18, 19, 49

*Munn v. City of Ocean Springs,*
    763 F.3d 437 (5th Cir. 2014) ............................................... 53

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Planned Parenthood Sw. Ohio Region v. DeWine*,
696 F.3d 490 (6th Cir. 2012)................................56

*Pub. Citizen v. Dep't of Just.*,
491 U.S. 440 (1989).........................................43

*Pub. Citizen v. Dep't of State*,
276 F.3d 634 (D.C. Cir. 2002)............................38

*Samaad v. City of Dallas*,
940 F.2d 925 (5th Cir. 1991)...............16, 56, 57

*Sears, Roebuck & Co. v. Mackey*,
351 U.S. 427 (1956).........................................64

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
444 U.S. 572 (1980)...................................*passim*

*Seila Law LLC v. CFPB*,
140 S. Ct. 2183 (2020)...............................*passim*

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)...........................................30

*State Nat'l Bank of Big Spring v. Lew*,
795 F.3d 48 (D.C. Cir. 2015).............................44

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
560 U.S. 702 (2010).........................................16

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014).........................................40

*Synar v. United States*,
626 F. Supp. 1374 (D.D.C. 1986)......................40

*Tetra Techs., Inc. v. Cont'l Ins. Co.*,
755 F.3d 222 (5th Cir. 2014)............................51

*Texas v. United States*,
352 F. Supp. 3d 665 (N.D. Tex. 2018)................52

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Texas v. United States*,
    945 F.3d 355 (5th Cir. 2019) ........................................................ *passim*

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ................................................... 34, 43

*United States v. Ochs*,
    842 F.2d 515 (1st Cir. 1988) ............................................... 41

*United States v. Perkins*,
    116 U.S. 483 (1886) ........................................................... 18

*United States v. Watkins*,
    10 F.4th 1179 (11th Cir. 2021) (en banc) ........................... 32

CONSTITUTIONAL & STATUTORY AUTHORITIES

U.S. Const. art. II ............................................................... 17

5 U.S.C. § 3132 ................................................................. 49

5 U.S.C. § 3392 ................................................................. 49

15 U.S.C. § 2051 ................................................................. 5

15 U.S.C. § 2052 ................................................................. 5

15 U.S.C. § 2053 ....................................................... *passim*

15 U.S.C. § 2056 ........................................................... 6, 20

15 U.S.C. § 2057 ................................................................. 6

15 U.S.C. § 2064 ........................................................... 7, 20

15 U.S.C. § 2065 ................................................................. 6

15 U.S.C. § 2068 ................................................................. 7

15 U.S.C. § 2069 ........................................................... 7, 19

15 U.S.C. § 2071 ........................................................... 7, 19

15 U.S.C. § 2076 ....................................................... 7, 19, 20

28 U.S.C. § 1291 ........................................................... 4, 60

ix

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

28 U.S.C. § 1331.................................................................... 4

Pub. L. No. 63-203, 38 Stat. 717 (1914) .................................. 23

Pub. L. No. 93-153, 87 Stat. 576 (1973) .................................. 24

Pub. L. No. 93-637, 88 Stat. 2183 (1975) ................................ 24

**OTHER AUTHORITIES**

1 Annals of Cong. 499 (1789) ................................................. 46

16 C.F.R. § 1015.1 ................................................................. 48

16 C.F.R. § 1015.7 ................................................................. 48

16 C.F.R. § 1025.1 ................................................................. 20

CPSC, *2022 Chief FOIA Officer Reports*................................. 50

CPSC, *CPSC Sues Amazon to Force Recall of Hazardous Products Sold on Amazon.com* (July 14, 2021)..................... 7

CPSC, *Regulations, Mandatory Standards, and Bans*............. 6

CPSC, *The Regulated Products Handbook* (May 6, 2013) ....... 6

Fed. R. App. P. 4 .................................................................... 4

Fed. R. Civ. P. 54 ............................................................ *passim*

*Fees for Production of Records*; *Other Amendments to Procedures for Disclosure of Information Under the Freedom of Information Act*, 86 Fed. Reg. 7499 (Jan. 29, 2021) .................................................................. 8

Gov't Accountability Office, GAO-21-56, *Consumer Product Safety Commission: Actions Needed To Improve Processes for Addressing Product Defect Cases* (Nov. 2020)................. 6

House Comm. on Oversight & Reform, *Policy and Supporting Positions*, 116th Cong. 2d Sess. (2020)........... 49

PCAOB, Release No. 104-2005-082, *Inspection of Beckstead & Watts, LLP* (Sept. 28, 2005)............................................ 45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Antonin Scalia & Frank Goodman, *Procedural Aspects of the Consumer Product Safety Act*, 20 UCLA L. Rev. 899 (1973) ........... 5, 7

10 Wright & Miller, Fed. Prac. & Proc. Civ. § 2657 (4th ed. Apr. 2022 update) .................................................... 64

15A Wright & Miller, Fed. Prac. & Proc. Juris. § 3914.7.2 (2d ed. Apr. 2022 update) .................................................. 62

John C. Yoo, *President's Authority To Remove the Chairman of the Consumer Product Safety Commission*, 25 Op. O.L.C. 171 (2001) ............................................................. 19, 31

## INTRODUCTION

The Consumer Product Safety Commission (CPSC or Commission) regulates nearly every aspect of our lives—from the mattresses in our beds, to the clothes in our closets, to the batteries in our devices, to the cribs in our nurseries. It can ban products, file enforcement suits, obtain injunctions, and secure eight-figure penalties. And for the 50 years since its creation, it has done all this without political accountability, because its five Commissioners cannot be removed by the President except "for neglect of duty or malfeasance in office." 15 U.S.C. § 2053(a).

Our Constitution demands better. Congress cannot restrict the President's authority to remove principal officers, apart from a narrow exception for "multimember expert agencies that do not wield substantial executive power." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199-2200 (2020). Here, however, there is no dispute that the Commission wields "substantial executive power" under any plausible standard. Accordingly, the Constitution requires that the Commissioners be accountable to the elected President, and hence to the people.

To rectify this constitutional violation, the district court granted plaintiffs a declaratory judgment on their constitutional claim. That

judgment ensures that plaintiffs' pending and future requests for consumer-product information under the Freedom of Information Act (FOIA) will be resolved only by an agency that is accountable to the President—the same remedy blessed in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 513 (2010). And to permit an immediate appeal while plaintiffs' remaining claims are pending, the court entered a partial final judgment—the same approach blessed in *Texas v. United States*, 945 F.3d 355, 373 n.11 (5th Cir. 2019), *rev'd and remanded on other grounds sub nom. California v. Texas*, 141 S. Ct. 2104 (2021).

The government's scattershot arguments seeking vacatur of that judgment uniformly fail. While the government accuses the district court of flouting *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court has made clear this "exception[]" to the President's removal power applies only to "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 140 S. Ct. at 2199-2200. By ignoring that holding, it is the government that is urging this Court to disregard Supreme Court precedent and extend *Humphrey's Executor* to permit a restriction on the President the Justices have never upheld.

Perhaps sensing its weakness on the merits, the government devotes the front half of its brief to disputing the district court's remedy— insisting that plaintiffs lack standing to obtain declaratory relief and that partial final judgment was improper. But *Free Enterprise Fund* confirmed that parties have both standing and a cause of action to seek declaratory relief that ensures the federal regulations that directly govern them are enforced and administered by officials accountable to the President. And contrary to the government's illusory distinction, the viability of a separation-of-powers claim does not turn on whether the relevant agency is responsible for administering the rules regarding financial services or FOIA requests. As for partial final judgment, the existence of independent claims here is even clearer than it was in *Texas*, as each of plaintiffs' three claims concerns a different injury, a different cause of action, and a different form of relief.

Ultimately, the government's litany of distractions cannot obscure the dispositive facts here. The Commission wields substantial executive power and it does so without the political accountability required by Article II. As *Seila Law* made clear, that framework cannot stand.

## JURISDICTIONAL STATEMENT

Plaintiffs sued the Commission asserting three separate causes of action arising under the Constitution, the Administrative Procedure Act (APA), and FOIA. ROA.12. The district court had jurisdiction under 28 U.S.C. § 1331. ROA.12; *see infra* at 34-50.

On March 18, 2022, the district court denied the government's motion to dismiss in part, granted plaintiffs a declaratory judgment on their constitutional claim, and entered partial final judgment. ROA.612-652; *see* Fed. R. Civ. P. 54(b). The government filed a timely notice of appeal on May 16, 2022. ROA.658-660; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291. *See infra* at 50-65.

## STATEMENT OF THE ISSUES

1.  Whether statutory for-cause removal restrictions applicable to principal officers of multimember agencies that wield substantial executive power violate the separation of powers.

2.  Whether parties have standing under Article III to obtain a declaratory judgment guaranteeing that an agency handling pending and future adjudications of their rights is accountable to the President under the separation of powers.

**3.**    Whether a complaint "presents more than one claim for relief" under Rule 54(b) when each of its three claims involves a different injury, a different cause of action, and a different form of relief.

## STATEMENT OF THE CASE

### A.    The Consumer Product Safety Commission

In 1972, Congress established the CPSC to "protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). This marked the first time "since the days of the New Deal" that Congress had decided "to create an independent commission for the purpose of imposing federal regulation on an established area of commercial activity." Antonin Scalia & Frank Goodman, *Procedural Aspects of the Consumer Product Safety Act*, 20 UCLA L. Rev. 899, 899 (1973). In doing so, Congress gave the CPSC authority over all "consumer product[s]," defined to include virtually all articles or components produced or distributed for sale to, or use by, a consumer—save for tobacco and certain other products already regulated under other regimes (such as boats and aircraft). 15 U.S.C. § 2052(a)(5).

Based on that delegation (and its authority to administer six other statutes), the CPSC exercises "jurisdiction over thousands of types of

consumer products used in the home, in schools, in recreation, or otherwise." CPSC, *The Regulated Products Handbook* 5 (May 6, 2013), https://bit.ly/2YeFe2j. Its purview reaches everything from batteries to bicycles, clothing to cribs, mattresses to mouthwash. *See* CPSC, *Regulations, Mandatory Standards, and Bans*, https://bit.ly/3ShBuJq (last visited Sept. 29, 2022). In total, the products subject to its control represent $1.6 trillion in consumption. Gov't Accountability Office, GAO-21-56, *Consumer Product Safety Commission: Actions Needed To Improve Processes for Addressing Product Defect Cases* 1 (Nov. 2020), https://bit.ly/3QQ3R09.

Along with that sweeping domain, the Commission was endowed with considerable powers. For example, Congress gave the CPSC broad rulemaking authority to "promulgate consumer product safety standards," 15 U.S.C. § 2056(a), as well "ban[]" hazardous products outright, *id.* § 2057. Congress also empowered the CPSC to inspect "any factory, warehouse, or establishment in which consumer products are manufactured or held," *id.* § 2065(a), and to demand that manufacturers and distributors produce "records" as to whether they are in compliance with its commands, *id.* § 2065(b).

Congress further made it "unlawful for any person" to manufacture, sell, distribute, or import any product within the Commission's purview that does not conform with the agency's rules or to fail to make premises and records available for inspection. *Id.* § 2068(a)(1), (3), & (4). To punish violations, the CPSC may file enforcement suits seeking civil penalties of up to $100,000 per violation, with a cap at $15 million for a "related series of violations." *Id.* §§ 2069(a)-(b), 2076(b)(7)(A). It can also sue in federal court for injunctive relief to "[r]estrain any violation" of its rules, *id.* § 2071(a), as well as for seizure of offending products, *id.* § 2071(b).

The Commission similarly exercises considerable power to initiate and conduct administrative adjudications. *Id.* § 2076(a); *see id.* § 2064(c), (d), (f). Last year, for example, it filed an administrative enforcement action seeking to compel Amazon to recall over 400,000 products. CPSC, *CPSC Sues Amazon to Force Recall of Hazardous Products Sold on Amazon.com* (July 14, 2021), https://bit.ly/3SGNVyl.

Along with conferring this wide-ranging authority, Congress took pains to ensure the Commission would enjoy "independence from presidential control." Scalia & Rich, *supra*, at 899. An "independent regulatory commission," the CPSC is run by five presidentially-

appointed, Senate-confirmed Commissioners who each serve a seven-year term. 15 U.S.C. § 2053(a), (b)(1). No more than three of the Commissioners can "be affiliated with the same political party." *Id.* § 2053(c). And each Commissioner enjoys removal protection: "Any member of the Commission may be removed by the President for neglect of duty or malfeasance in office but for no other cause." *Id.* § 2053(a).

## B.     **This Lawsuit**

1.     Plaintiffs Consumers' Research and By Two, L.P. are two educational organizations that conduct research on consumer products. ROA.13-14. To that end, they regularly submit FOIA requests to the CPSC—over 80 to date—seeking information about products such as baby cribs, batteries, and trampolines. ROA.13-14, 23-27, 182-196, 617.

In 2021, the Commission adopted a rule increasing the fees FOIA requesters must pay to obtain documents. *Fees for Production of Records*; *Other Amendments to Procedures for Disclosure of Information Under the Freedom of Information Act*, 86 Fed. Reg. 7499 (Jan. 29, 2021) (2021 rule). In the wake of that rule, plaintiffs submitted FOIA requests to the CPSC along with fee waivers. ROA.120-121, 147, 156, 165-166.

After the Commission denied these requests and fee waivers, as well as plaintiffs' administrative appeals, plaintiffs sued the CPSC in district court, asserting three separate counts. ROA.23-30, 35-42. Count I relied on an implied cause of action under the Constitution and sought a declaratory judgment that the removal restriction in 15 U.S.C. § 2053(a) violated the separation of powers. ROA.35-37, 41. Count II relied on a cause of action under the APA and sought vacatur of the 2021 rule on the ground that it was issued by an agency unaccountable to the President. ROA.38-39, 41. Count III relied on a cause of action under FOIA and sought an order compelling the Commission to reconsider plaintiffs' FOIA requests without applying the 2021 rule. ROA.39-42.

**2.** The district court denied in part the government's motion to dismiss, granted plaintiffs' motion for partial summary judgment as to their constitutional claim, and entered partial final judgment on that claim. ROA.612-652.

**a.** With respect to standing, the court identified three injuries to plaintiffs traceable to the Commission that the court could redress. ROA.619-626.

*First*, plaintiffs had shown *informational* injuries from the Commission's refusal to furnish their requested information under FOIA. ROA.620-621. While the CPSC had released some responsive records during the litigation, that did not moot the case in light of plaintiffs' other pending and future FOIA requests. ROA.625-626.

*Second*, plaintiffs had established *financial* injury from the increased fees under the 2021 rule. ROA.621-623. In addition to the harms associated with the Commission's past denials of plaintiffs' requests for fee waivers, plaintiffs would face "future liability for the increased FOIA fees" given their "habitual[]" practice of submitting FOIA requests to the CPSC. ROA.622-623.

*Third*, plaintiffs had demonstrated an ongoing *constitutional* injury from having their pending and future FOIA requests regulated and adjudicated by an unconstitutionally structured agency. ROA.623-625. They consequently had the "right to seek 'redress for the injury of having to appear before' a constitutionally suspect agency." ROA.624 (quoting *Cochran v. SEC*, 20 F.4th 194, 209 (5th Cir. 2021) (en banc), *cert granted*, 142 S. Ct. 2707 (2022)).

10

**b.** Turning to the merits, the court applied *Seila Law*, which held that save for "two" "narrow and limited" "exceptions," the "'general rule' is that 'the President possesses the authority to remove those who assist him in carrying out his duties.'" ROA.628 (quoting *Seila Law*, 140 S. Ct. at 2198, 2206) (cleaned up). Because the Commissioners are "principal" officers, the court explained, this case "turns on the *Humphrey's Executor* exception," which permits "removal restrictions on members of 'multimember expert agencies that do not wield substantial executive power.'" ROA.628-629 (quoting *Seila Law*, 140 S. Ct. at 2199-2200).

The court determined that "the *Humphrey's Executor* exception does not apply to the Commission." ROA.629. It noted that the government did "not dispute"—and in fact "conceded"—that the CPSC wields "executive power." ROA.634-635; *see* ROA.728. And by any metric, the court explained, that executive power is "substantial." ROA.634. As just one example, "the Commission holds the 'quintessentially executive power not considered in *Humphrey's Executor*' to file suit in federal court 'to seek daunting monetary penalties against private parties' as a means of enforcement." ROA.635 (quoting *Seila Law*, 140 S. Ct. at 2200).

That the CPSC is a "multimember" agency did not change the analysis. ROA.637. While an agency's "multimember structure" may help demonstrate it "does not wield executive power," the court explained, it does not end the inquiry. ROA.636-637. To hold otherwise, the court reasoned, would "ignore[] a significant basis of the Supreme Court's holding in *Humphrey's Executor*—that the FTC exercised 'no part of the executive power.'" ROA.636. Because *Humphrey's Executor* by its own terms did not consider the validity of a removal restriction for an agency that *does* wield substantial executive power, it did not control. *Id.*

**c.** With respect to remedy, the court ruled that plaintiffs had both standing and a cause of action to seek a declaratory judgment that the removal restriction violated the separation of powers. ROA.623-625, 642-645. As it observed, plaintiffs were materially indistinguishable from the challengers in *Free Enterprise Fund*, as they were suffering a "constitutional injury from the threat of being subject to a regulatory scheme and governmental action lacking Article II oversight." ROA.624.

That remained true even though plaintiffs are not "facing a civil or criminal enforcement action," but "choose to subject themselves to FOIA regulations." ROA.624, 643. Plaintiffs' "right to obtain information

through FOIA—a right essential to their operations—is subject to the Commission's regulations and decisions governing FOIA requests," and they "have a right to ensure that these regulations and decisions are issued by officials who answer to the President." ROA.645. A declaratory judgment establishing that the removal restriction here violated Article II would vindicate that right by providing "prospective relief from the Commission's ongoing processing of their FOIA requests without proper presidential oversight." ROA.646. The court therefore granted plaintiffs' motion for partial summary judgment as to Count I. ROA.649.

The court then ruled that partial final judgment was appropriate under Rule 54(b). As it observed, the government did "not dispute" that plaintiffs' constitutional claim in Count I "is an independent claim" or that "declaring the removal restriction unconstitutional is an 'ultimate disposition' of that claim." ROA.647. Relying on the *Texas* litigation, the court agreed with that implicit concession, explaining that "Count I seeks declaratory relief under Article II of the Constitution"—relief that "fully remedies their ongoing constitutional injury"—"whereas Counts II and III seek to set aside the Final Rule and the FOIA determinations under the APA and FOIA, respectively." ROA.647.

The court also found there was "no just reason for delay." ROA.647. Given that "Counts II and III require addressing additional complex and novel questions about the appropriate relief" on those separate claims, disposing of Count I would permit "the parties to immediately appeal the constitutional question and potentially avoid the time and resources necessary to address Counts II and III." ROA.648. The court thus denied the government's motion to dismiss only in part, and "reserve[d] ruling on whether Plaintiffs have stated a claim for retrospective relief under *Collins*, which they seek under Counts II and III only." ROA.649.

## SUMMARY OF THE ARGUMENT

**I.A.**   Under our Constitution, the President generally enjoys the authority to remove those who exercise executive power on his behalf. While *Humphrey's Executor* recognized a narrow exception for principal officers of "multimember expert agencies that do not wield substantial executive power," *Seila Law*, 140 S. Ct. at 2199-2200, that exception does not apply here. Congress bestowed the CPSC with a panoply of executive powers, including the ability to seek stiff penalties against private parties on the government's behalf in court.  The district court thus correctly held that the removal restriction here violates the separation of powers.

14

**B.** While the government asks this Court to extend the exception in *Humphrey's Executor* to multimember agencies that wield substantial executive power, it offers no good reason to do so. For example, the government claims the 1935 FTC in *Humphrey's Executor* also exercised substantial executive power, but that theory was squarely rejected in *Seila Law*. The rest of its case amounts to unilluminating snippets from recent separation-of-powers decisions and the charge that plaintiffs seek to overrule Supreme Court precedent. But by urging this Court to turn a blind eye to *Seila Law*—and the actual holding in *Humphrey's Executor*— it is the government that is trying to evade the Supreme Court here.

**II.** Precedent likewise forecloses the government's two objections to the relief entered below.

**A.** *Free Enterprise Fund* disposes of the assertion that plaintiffs lack standing to seek a declaratory judgment on their constitutional claim. That case made clear parties have standing and a cause of action to pursue declaratory relief ensuring the rules governing them are applied by executive officials accountable to the President. While the government insists this avenue for redress vanishes when FOIA requests are involved, neither reason nor authority permits that exception.

**B.**    The government is no more persuasive in contending that plaintiffs' constitutional claim is not an independent claim under Rule 54(b). This argument, which is parasitic on the government's flawed standing theory, was never advanced below. And for good reason: the three claims here involve different injuries, different causes of action, and different forms of relief. Indeed, the basis for a Rule 54(b) appeal here is even stronger than in *Texas*, where this Court held—at the government's urging—that a constitutional claim seeking declaratory relief was independent from the remaining claims that hinged on its success.

## STANDARD OF REVIEW

This Court reviews *de novo* the constitutionality of a federal statute, *Brackeen v. Haaland*, 994 F.3d 249, 298 (5th Cir. 2021) (en banc), *cert. granted*, 142 S. Ct. 1205 (2022); questions of Article III standing, *id.* at 291; and whether a complaint presents "more than one claim for relief" under Rule 54(b), *Samaad v. City of Dallas*, 940 F.2d 925, 930 (5th Cir. 1991), *abrogated on other grounds by Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 728 (2010).

## ARGUMENT

### I.    CONGRESS'S LIMIT ON THE PRESIDENT'S ABILITY TO REMOVE THE COMMISSIONERS VIOLATES THE SEPARATION OF POWERS.

The district court correctly determined that under Supreme Court precedent, the for-cause removal restriction in 15 U.S.C. § 2053(a) violates the separation of powers. Article II requires principal officers who wield substantial executive power—the Commissioners included—to be accountable to the President through removal. And when the government finally addresses this question in the last 10 pages of its brief, it offers no meaningful reason to question that conclusion.

### A.    The Commission's Structure Defies the Constitution.

**1.**    "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 140 S. Ct. at 2191 (quoting U.S. Const. art. II, §§ 1, 3). Since it "would be impossible for one man to perform" all of the duties of the Executive Branch, the Constitution "assumes" the President will carry out his obligations through "lesser executive officers." *Id.* at 2197 (cleaned up). Because "[t]hese lesser officers must remain accountable to the President, whose authority they wield," the President's executive power necessarily extends to "'appointing, overseeing, and controlling

17

those who execute the laws.'" *Id.* And the power to control executive officials, in turn, "includes the ability to remove" them. *Id.* Otherwise, the President would have no way to ensure that executive officials obey his commands. In that situation, the President "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 2191.

The President's power to remove executive officials thus remains "the rule, not the exception." *Id.* at 2206. Although the Supreme Court has recognized "two" "exceptions" to the removal power, they are narrowly limited. *Id.* at 2199. First, *Humphrey's Executor* recognized an exception for principal officers heading "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199-2200; *see Humphrey's Executor*, 295 U.S. at 628 (explaining the officers "exercise[d] no part of the executive power"). Second, *Morrison v. Olson*, 487 U.S. 654 (1988), and *United States v. Perkins*, 116 U.S. 483 (1886), recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2200. These two exceptions mark "'the outermost constitutional limits of permissible congressional restrictions on the President's removal power.'" *Id.*

**2.**    In creating the CPSC, Congress sought to restrict the President's removal power over the Commissioners even though neither exception applies. 15 U.S.C. § 2053(a). "The parties agree that the *Morrison* exception is inapplicable" because the Commissioners "are principal, rather than inferior, officers." ROA.629. And the *Humphrey's Executor* exception does not apply because the Commission exercises "substantial executive power." *Seila Law*, 140 S. Ct. at 2200.

*First*, the CPSC wields substantial executive power because it has robust "enforcement authority," which "includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Id.* Specifically, it can bring suits seeking injunctive relief and civil penalties of up to $100,000 per violation, and up to $15 million for a series of violations. *See* 15 U.S.C. §§ 2069, 2071, 2076(b)(7). Thus, as even the government agrees, "the CPSC's main responsibilities include" its "law-enforcement functions," John C. Yoo, *President's Authority To Remove the Chairman of the Consumer Product Safety Commission*, 25 Op. O.L.C. 171, 173 (2001)—a classic example of "'executive power,'" *Buckley v. Valeo*, 424 U.S. 1, 139 (1976).

19

*Second*, "[s]imilar to the Bureau in *Seila Law*, the Commission 'may promulgate consumer product safety standards' affecting a wide range of consumer products on the market." ROA.634 (quoting 15 U.S.C. § 2056(a)); *see Seila Law*, 140 S. Ct. at 2200. Because "interpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law," an agency "empowered to issue a 'regulation or order' … clearly exercises executive power." *Collins v. Yellen*, 141 S. Ct. 1761, 1785-86 (2021) (cleaned up). Indeed, one of the primary reasons that agencies are allowed to make "policy choices" in issuing rules is that they answer to an elected President: "While agencies are not directly accountable to the people, the Chief Executive is." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 865 (1984).

*Third*, the CPSC has "the power to 'unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications.'" ROA.635 (quoting *Seila Law*, 140 S. Ct. at 2200); *see* 15 U.S.C. §§ 2064, 2076(a); 16 C.F.R. § 1025.1. Like rulemakings, adjudications "are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power." *Seila Law*, 140 S. Ct. at 2198 n.2 (cleaned up); *see City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013).

In short, the Commission wields substantial executive power from top to bottom, but without any accountability to the President through the removal power. Unlike the 1935 FTC in *Humphrey's Executor*, the CPSC cannot remotely be described "as a mere legislative or judicial aid" that "exercise[s] 'no part of the executive power.'" *Seila Law*, 140 S. Ct. at 2198, 2200. Rather, like its descendant the CFPB, the Commission can "issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties"—all "without meaningful supervision." *Id.* at 2203-2204; *see id.* at 2192 (observing the CFPB was "modeled after" the Commission). Because the removal restriction here cannot fit within the *Humphrey's Executor* exception, it violates the separation of powers.

## B.    The Government's Contrary Arguments Are Meritless.

Rather than dispute that the CPSC wields substantial executive power, the government offers three arguments for extending *Humphrey's Executor* to cover this situation. *See* Br. 25-34. None is persuasive.

**1.**    To start, the government claims if the analysis above is right, then "*Humphrey's Executor* was wrong the day it was decided, because the FTC in 1935 also had what the district court would call 'substantial

executive power,'" as it had authority to "issue cease-and-desist orders, to bring enforcement actions, and to issue regulations." Br. 33. But as the district court noted, "[t]his argument was raised by the dissenting Justices in *Seila Law* and rejected by a majority of the Court." ROA.636.

The *Seila Law* dissent, citing the same provisions the government invokes here, asserted that the 1935 FTC "had statutory rulemaking authority"; could "run investigations, bring administrative charges, and conduct adjudications"; and could pursue "enforcement" of its cease-and-desist orders "in federal court" if a person "refused to comply with an order." 140 S. Ct. at 2239 n.10 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part); *see* Br. 33. The majority dismissed that argument, explaining that "what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court." 140 S. Ct. at 2200 n.4 (majority opinion). And "[r]ightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Id.* at 2198 (majority opinion). The dissent's position has not improved since the Supreme Court rejected it two years ago.

Indeed, the government itself has recognized that the 1935 FTC in *Humphrey's Executor* was meaningfully different from agencies such as the CPSC that have authority to seek penalties by filing enforcement suits in court. As the Solicitor General told the Supreme Court just a few years ago in *Seila Law*, "the FTC in 1935" lacked "the ability to bring enforcement suits in federal court seeking retrospective relief"—a power that "'cannot possibly be regarded' as anything other than an exercise of the executive power and duty vested solely in the President." U.S. Br. 32, *Seila Law*, 140 S. Ct. 2183 (No. 19-7), 2019 WL 6727094 (U.S. *Seila Law* Br.). The Supreme Court agreed, emphasizing that "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court" is "a quintessentially executive power not considered in *Humphrey's Executor*." 140 S. Ct. at 2200.

By contrast, the 1935 FTC did not itself have enforcement power, but only the ability to petition an appellate court to enforce its adjudicative orders—an authority the *Humphrey's Executor* Court evidently saw as one of the FTC's "quasi judicial powers." 295 U.S. at 628; *see id.* at 620-21; Pub. L. No. 63-203, § 5, 38 Stat. 717, 720 (1914). Congress did not give the FTC the authority to sue in court to seek civil

penalties—or permanent injunctive relief in the absence of an agency adjudication—until the 1970s, around the time it created the CPSC. *See* Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973); Pub. L. No. 93-637, §§ 205-206, 88 Stat. 2183, 2200-2202 (1975). So even if the 1935 FTC's "latent" powers were somehow relevant here—contrary to the Supreme Court's holding in *Seila Law*, 140 S. Ct. at 2200 n.4—they would not change the outcome of this case.

**2.**     Tacitly conceding that *Humphrey's Executor* alone cannot salvage the removal restriction here, the government insists that "more recent separation of powers rulings" bolster its position. Br. 27. This strategy is no more defensible.

**a.**     The government begins (Br. 33) with the observation that *Free Enterprise Fund* stated *Humphrey's Executor* "held that Congress can, *under certain circumstances*, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." 561 U.S. at 483 (emphasis added). But what those "certain circumstances" were, *Free Enterprise Fund* did not say. Rather, that question was answered by *Seila Law*, which expressly addressed "the contours of the *Humphrey's Executor*

24

exception," and held that it applied only to "multimember expert agencies *that do not wield substantial executive power*." 140 S. Ct. at 2198-2200 (emphasis added). For the same reason, this Court's pre-*Seila Law* remark that *Humphrey's Executor* "applie[s] only to multi-member bodies of experts" is of no moment. *Collins v. Mnuchin*, 938 F.3d 553, 563, 595 (5th Cir. 2019) (en banc), *aff'd in part, vacated in part, rev'd in part*, 141 S. Ct. 1761; *see* Br. 29. Neither the Supreme Court in *Free Enterprise Fund* nor this Court in *Collins* addressed whether the multimember nature of an agency is a *sufficient* condition to qualify for the *Humphrey's Executor* exception, instead of a merely *necessary* one. As *Seila Law* now makes clear, principal officers must be subject to the removal power unless their agency is *both* "multimember" *and* does not wield "substantial executive power." 140 S. Ct. at 2199-2200.

Nor is it meaningful that *Free Enterprise Fund* "severed the inferior officer's removal restrictions" rather than call into question the stipulated removal restrictions applicable to the SEC Commissioners. Br. 27. As the government acknowledges (Br. 33), the scope and validity of *Humphrey's Executor* was simply not on the table in *Free Enterprise Fund*. *See* 561 U.S. at 483. Indeed, while the parties in that case may have

"agree[d] that the Commissioners cannot themselves be removed by the President" except for cause, those officers were not covered by any express statutory removal restriction. *Id.* at 487; *see id.* at 546 (Breyer, J., dissenting) ("[T]he statute that established the Commission says nothing about removal."). And in all events, it is hornbook law that "'[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'" *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). *Free Enterprise Fund* thus did not address the issue presented here.

**b.** The government next quotes from (Br. 27-28) this remedial discussion in *Seila Law*: "[T]here may be means of remedying the defect in the CFPB's structure that the Court lacks the authority to provide. Our severability analysis does not foreclose Congress from pursuing alternative responses to the problem—for example, converting the CFPB into a multimember agency." 140 S. Ct. at 2211. But this severability statement is no more illuminating than the one in *Free Enterprise Fund*. As the district court explained, while *Seila Law* "noted in dictum that one remedy to the removal-restriction problem 'may be' 'converting the CFPB

into a multimember agency,'" it "did not hold that Congress could create multimember agencies wielding substantial executive power and then restrict the President's power to remove their members." ROA.638. Put differently, *Seila Law* used conditional language because converting the CFPB into a multimember agency "may" (or may not) have fixed the constitutional problem, depending on whether that agency was *also* stripped of its executive powers—the other requirement for application of the *Humphrey's Executor* exception.

**c.** Finally, the government claims (Br. 34) that *Collins* somehow disavowed the role of executive power in the removal inquiry when it stated that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." 141 S. Ct. at 1785. Read in context, that language establishes the opposite.

In responding to the argument that "Congress should have greater leeway to restrict the President's power to remove the FHFA Director because the FHFA's authority is more limited than that of the CFPB," *Collins* emphasized that "the nature and breadth of an agency's authority

27

is not dispositive in determining whether Congress may limit the President's power to remove its head." *Id.* at 1784. That was because the "President's removal power serves vital purposes even when the officer subject to removal is not the head of one of the largest and most powerful agencies," including "maintain[ing] a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch"—in other words, exercise executive power. *Id.*; *see Seila Law*, 140 S. Ct. at 2191 (equating "'those who assist [the President] in carrying out his duties'" as "those who wield executive power on his behalf").

Thus, if anything, this discussion in *Collins* indicates that the exercise of *any* executive power is enough to take an agency outside the *Humphrey's Executor* exception. And that reading fits with *Humphrey's Executor* itself, which "viewed the FTC (as it existed in 1935) as exercising '*no part* of the executive power.'" *Seila Law*, 140 S. Ct. at 2198 (emphasis added). At a minimum, *Collins* confirms that so long as a principal officer's executive power is not insubstantial, the officer must be subject to presidential control through removal. Beyond a de minimis threshold, the *degree* of executive power makes no difference.

Indeed, if executive power were irrelevant, the Court would not have gone on to devote a subsection to rejecting the argument that the FHFA Director "does not wield executive power." *Collins*, 141 S. Ct. at 1785; *see id.* at 1785-86. So even if courts may not be "well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," *Collins* confirms they are quite adept at determining whether a given agency "exercises executive power" at all. *Id.* at 1785-86.

**3.** That leaves the government with nothing more than its tiresome lecture on "stare decisis," Br. 29-34—a lecture that is beside the point. Contrary to the government's insistence, plaintiffs are not urging this Court "'to overrule'" any precedent, from the Supreme Court or otherwise, nor did the district court purport to overrule anything. Br. 34.

Rather, plaintiffs are asking this Court to "apply the Supreme Court's binding decisions," Br. 32—which include *Seila Law*. And *Seila Law* was emphatic that the exception in *Humphrey's Executor* is confined to "multimember expert agencies that do not wield substantial executive power." 140 S. Ct. at 2199-2200; *see, e.g.*, *id.* at 2192 (the CFPB "wields significant executive power"); *id.* at 2201 (the CFPB "is vested with significant executive power); *see also id.* at 2211 ("[T]he Court takes a

step in the right direction by limiting *Humphrey's Executor* to 'multimember expert agencies that *do not wield substantial executive power*'") (Thomas, J., concurring in part and dissenting in part).

In response, the government never even mentions that *Seila Law* establishes that the *Humphrey's Executor* "exception[]" applies only to "multimember expert agencies that do not wield substantial executive power," and that "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court" is "a quintessentially executive power not considered in *Humphrey's Executor*." *Id.* at 2199-2200 (majority opinion). Instead, it (apparently) brushes off these conclusions as the district court's "own understanding of the Supreme Court's rationale in *Seila Law*." Br. 29. But there is no need to consult the opinion below to divine *Seila Law*'s "rationale"—that case's reasoning speaks for itself, as confirmed by the government's studious efforts to avoid engaging with it. And it is blackletter law that "the well-established rationale upon which the Court based the result[]" of a decision is just as binding as "the result" itself. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996).

By contrast, *Humphrey's Executor* did not broadly hold that "for-cause removal restrictions are constitutional for multi-member agencies." Br. 15. Rather, as the government has long understood, *Humphrey's Executor* "upheld a for-cause removal provision" over FTC members "due to the Commission's 'quasi-legislative or quasi-judicial' functions." 25 Op. O.L.C. at 172. Or, as the Solicitor General told the Supreme Court a few years ago, "'the narrow point actually decided in *Humphrey's Executor* was only' that Congress could limit the President's ability to remove a commissioner of the multimember FTC" as it existed at the time, and thus "statements in that opinion 'beyond the point involved do not come within the rule of stare decisis.'" U.S. *Seila Law* Br. 44 (cleaned up). And that was "all the more so," the government went on, "since *Humphrey's Executor* expressly left 'for future consideration and determination' whether Congress may restrict the President's power to remove principal officers different from 'such as that were there involved.'" *Id.* (cleaned up).

Indeed, the government went so far as to ask the Supreme Court to "overrule[]" *Humphrey's Executor* if "necessary," in part because "there are minimal reliance interests in the removability of principal executive officers." *Id.* at 44-45. Especially in light of that background, the

government's misplaced paean to stare decisis here should be taken with more than a grain of salt.

Rather, if there is anyone here who is urging this Court to "'ignore a decision from the Supreme Court,'" Br. 31, it is the government. In *Seila Law*, "the Supreme Court told" this Court what *Humphrey's Executor* means; this Court should not "tell the Supreme Court that it was wrong" in *Seila Law* "about what its holding in" *Humphrey's Executor* actually was. *United States v. Watkins*, 10 F.4th 1179, 1182 (11th Cir. 2021) (en banc) (addressing different context); *see, e.g.*, *Hall v. Louisiana*, 884 F.3d 546, 550-51 (5th Cir. 2018) (declining to follow earlier Supreme Court cases that "contain broad, abstract propositions" when "the Supreme Court has effectively cabined this broad language in later opinions"). While the government wants "to extend" the exception in *Humphrey's Executor* to a situation "never before confronted by" the Supreme Court, *Seila Law* confirms that door is closed. 140 S. Ct. at 2211.

In fact, this Court has already received the message loud and clear. As it recently confirmed, *Seila Law* "limit[ed] the *Humphrey's Executor* exception … to cases involving for-cause removal protections given to a multimember body of experts, balanced along partisan lines, that

perform legislative and judicial functions and are said not to exercise *any* executive power." *Jarkesy v. SEC*, 34 F.4th 446, 464 n.19 (5th Cir. 2022) (cleaned up) (emphasis added); *accord Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 444 (5th Cir. 2022). The government's position is therefore at war not only with Supreme Court precedent, but this Court's own.

Finally, the government asserts that affirming the district court "would call into question longstanding removal provisions" for other "multi-member agencies." Br. 32. But the Supreme Court has already held that the test for the validity of a principal officer's removal restriction turns on whether his agency "wield[s] substantial executive power." *Seila Law*, 140 S. Ct. at 2199-2200. For this Court to recognize that holding (for the third time) will not upset any apple carts. Nor is there any need here to trawl through the multimember agencies scattered throughout the government to determine whether or not they meet the *Seila Law* test. As the model for the CFPB, which *Seila Law* addressed, the CPSC is an easy case. For other agencies not at issue here, what *Free Enterprise Fund* said remains true today: "the very size and variety of the Federal Government … [should] discourage general pronouncements on matters neither briefed nor argued." 561 U.S. at 506.

## II.   THE DISTRICT COURT ISSUED APPROPRIATE RELIEF.

Underscoring the weakness of its merits position, the government leads its brief with two procedural objections. According to the government, the district court's partial final judgment disposing of plaintiffs' constitutional claim through declaratory relief runs afoul of both Article III and Rule 54(b). The government is wrong on both fronts.

### A.   Plaintiffs Have Standing To Seek Declaratory Relief.

Starting with Article III, the government insists (Br. 21-25) plaintiffs lack standing to pursue a declaratory judgment on their constitutional claim. To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The government does not dispute redressability. *See* Br. 21 n.3. Instead, it contends plaintiffs cannot satisfy the injury and traceability prongs by showing (i) "they will imminently suffer a cognizable injury" (ii) "resulting from the Commission's structure." Br. 22. That argument runs headlong into *Free Enterprise Fund*.

**1.**    As *Free Enterprise Fund* makes clear, parties have standing to obtain a declaratory judgment guaranteeing the rules by which they are governed are administered by executive officials who are accountable to the President (and hence to the public). In that case, an accounting firm sought a declaratory judgment that Congress had "contravened the separation of powers by conferring wide-ranging executive power" on members of the PCAOB "without subjecting them to Presidential control." 561 U.S. at 487. The Court observed this "separation-of-powers violation" subjected the plaintiff to a form of unconstitutional governance, inflicting "a 'here-and-now' injury that can be remedied by a court" through a declaratory judgment. *Id*. at 513. It therefore held the firm (and an organization to which it belonged) were "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *Id.*

In other words, the "'here-and-now injury" in *Free Enterprise Fund* justifying that prospective relief was that the firm was "subject" to "reporting requirements and auditing standards" administered by officials insulated from political accountability by an unconstitutional

removal restriction. *Id.*; *see Collins*, 141 S. Ct. at 1779 (describing *Free Enterprise Fund* as involving an "injury from allegedly unlawful agency oversight").   Simply put, Americans have a right for the laws to be administered by accountable officials, and depriving them of that right is an ongoing injury. A declaratory judgment stating that the removal restriction at issue violated the separation of powers necessarily cured that harm by vindicating the firm's right to have "the Board's regulations and decisions governing the accounting industry" be "issued by officials who answer to the President." ROA.645.

Plaintiffs here seek the same relief to redress the same harm. Like the accounting firm in *Free Enterprise Fund*, they are currently harmed by being "subject to governmental action by executive officials who are not properly accountable to the President." ROA.645. Just as the firm's "right to operate an accounting business was subject to the Board's regulations and decisions governing the accounting industry," plaintiffs' "right to obtain information through FOIA—a right essential to their operations—is subject to the Commission's regulations and decisions governing FOIA requests." ROA.645. Without a declaratory judgment, plaintiffs' pending and future FOIA requests, like the firm's auditing

36

activities in *Free Enterprise Fund*, will be regulated and decided by an agency unlawfully shielded from presidential oversight. Declaratory relief cures that injury by "ensur[ing] that these regulations and decisions are issued by officials who answer to the President." ROA.645.

**2.** The government tries to distinguish *Free Enterprise Fund* on both injury and traceability. Neither attempt survives scrutiny.

**a.** With respect to injury, the government offers two reasons why this case is different from *Free Enterprise Fund*. Each fails.

*First*, the government asserts it is "conjectural whether plaintiffs will be injured by" the lack of executive accountability through an "improper application of costs and fees related to processing" their "future FOIA requests." Br. 24. But the relevant injury here is not an increase in costs associated with plaintiffs' pending and future FOIA requests; it is that those requests will be handled by an agency unconstitutionally shielded from presidential oversight. By way of analogy, no one thinks the Board in *Free Enterprise Fund* could have evaded declaratory relief merely by claiming it was "conjectural" whether the accounting firm would ever be sanctioned for violating auditing standards. That was because the "'here-and-now' injury" faced by the

firm was that those "standards" were being "enforced" by an agency that was not "accountable to the Executive." 561 U.S. at 513. So too here.

In any event, there is no need for "conjecture" about costs either: the government does not deny that plaintiffs' pending and future FOIA requests will be subject to increased financial burdens under the 2021 rule. *See* ROA.621-623. And to the extent the government implausibly suggests that the Commission will grant fee waivers for *all* their FOIA requests, courts "have never allowed agencies to defeat judicial review of their standards by occasionally waiving them in individual cases." *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 641 (D.C. Cir. 2002).

*Second*, the government contends that plaintiffs, unlike the accounting firm in *Free Enterprise Fund*, do not face any imminent injury because they "are not regulated by the Commission or subject to any enforcement regime." Br. 24. The district court correctly dismissed this theory below, where the government used it to challenge both Article III standing and the availability of a cause of action. ROA.624, 643-645; *see* ROA.364-368, 562-563. The government has wisely abandoned its claim that plaintiffs lack a cause of action, and its theory is no more viable when confined to Article III. *See Free Enter. Fund*, 561 U.S. at 491 n.2

(confirming there exists an "'implied private right of action directly under the Constitution to challenge governmental action under … separation-of-powers principles'"); *Collins*, 938 F.3d at 587 & n.227 (explaining that any "plaintiff with Article III standing can maintain a direct claim against government action that violates the separation of powers").

Nothing in *Free Enterprise Fund* suggests that the imminence of the firm's injury—and its entitlement to declaratory relief—turned on the fact that the firm "operated in a highly regulated area" and was subject to an "enforcement regime." Br. 24. While a "failure to follow Board rules" could trigger stiff penalties, *id.*, the relevant injury was being subject to a process overseen by an unaccountable agency—whether or not the firm was ultimately sanctioned. *See supra* at 37-38.

Likewise, while the "highly regulated" nature of the "financial services" industry, Br. 24, meant that the firm would likely be "subject" to "standards" administered by an agency that was not "accountable to the Executive" in the future, *Free Enter. Fund*, 561 U.S. at 513, the same is true here. As the district court observed, plaintiffs "rely heavily and frequently on FOIA to conduct work that is essential to the performance of certain of their primary institutional activities," meaning "the

Commission's FOIA regulations affect the Plaintiffs' daily conduct and decision-making." ROA.645 n.8 (cleaned up). There is consequently at least a "substantial risk," if not a "certainly impending" guarantee, that plaintiffs' FOIA requests will be handled by an unaccountable agency going forward. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).

Confirming the point, the government's argument cannot be squared with other separation-of-powers cases. Take, for instance, *Bowsher v. Synar*, 478 U.S. 714 (1986)—the case *Free Enterprise Fund* quoted for the proposition that "a separation-of-powers violation may create a 'here-and-now' injury that can be remedied by" a declaratory judgment. 561 U.S. at 513. The relevant plaintiffs there were not highly-regulated entities facing pending enforcement actions, but federal retirees whose "threatened injury" was that their cost-of-living adjustments would be cancelled "pursuant to an unconstitutional process"—namely, one involving a Comptroller General insulated from presidential removal. *Synar v. United States*, 626 F. Supp. 1374, 1381 (D.D.C. 1986); *see Bowsher*, 478 U.S. at 721 (agreeing the retirees had standing).

Similarly, this Court in *Collins* approved of "prospective relief" in the form of a "declaration" that a removal restriction concerning the FHFA Director was unconstitutional, even though the plaintiffs there were merely shareholders of Fannie Mae and Freddie Mac. 938 F.3d at 563, 595. And while that claim for prospective relief became moot while the case was before the Supreme Court, that Court never suggested it was improper in the first place simply because "'the only entities'" the FHFA "'regulates are themselves not purely private actors.'" 141 S. Ct. at 1786. To the contrary, it rejected that distinction "because the President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives." *Id.* Accepting the government's dichotomy for remedial purposes would therefore "let in through the back door" the precise "theory that the Supreme Court tossed out the front." *United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988).

The government fares no better in saying that plaintiffs face no injury because they chose to subject themselves to an unconstitutional process by "submitt[ing] FOIA requests." Br. 24. But the fact that

plaintiffs are "not 'forced'" to file FOIA requests does not mean they "lack standing." *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015). Rather, they may "seek redress for the injury of having to appear before" an unconstitutionally insulated agency. *Cochran*, 20 F.4th at 209; *see id.* at 233 (Oldham, J., concurring) (explaining that under *Free Enterprise Fund*, anyone "subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding").

That makes sense. As the district court explained, plaintiffs have a "statutory right" under FOIA to obtain information—"a right essential to their operations." ROA.645 & n.34. Plaintiffs thus have a corresponding right for their FOIA requests to be processed by a constitutionally structured agency. The same was true of the firm in *Free Enterprise Fund*. While it too could have freed itself of the Board's yoke by forgoing its "right to operate an accounting business," it had a right to run a business subject to constitutional governance. ROA.645.

Indeed, as the government admitted below, the upshot of its theory is that even a "baby crib manufacturer" would lack standing to challenge CPSC rules because it could simply avoid regulation by refraining from

placing a "new crib … subject to regulation" on the "market"—in other words, shut down its business. ROA.716-717. That is absurd on its face. Just as courts "do not require plaintiffs to 'bet the farm'"—or the baby crib—"before 'testing the validity of the law,'" they do not deny declaratory relief merely because a plaintiff could have chosen not to exercise its rights, whether in the financial markets or the FOIA realm. *Free Enter. Fund*, 561 U.S. at 490.

Ultimately, the government's real beef is that while only some can run an accounting firm, anyone "can file a FOIA request." ROA.706. But the Supreme Court has held that "public-disclosure or sunshine laws that entitle all members of the public to certain information"—FOIA included—do not defy the ban on adjudicating generalized grievances. *TransUnion*, 141 S. Ct. at 2214 (citing *Pub. Citizen v. Dep't of Just.*, 491 U.S. 440 (1989), and *FEC v. Akins*, 524 U.S. 11 (1998)). Thus, "the fact that numerous citizens might request the same information" under FOIA does not mean that "those who have been denied access do not possess a sufficient basis to sue." *Pub. Citizen*, 491 U.S. at 450. And "there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992).

In any event, plaintiffs are unusual because they run consumer-research operations and are "frequent FOIA requesters," ROA.707, meaning that the Commission, "by regulating and processing FOIA requests," will be "acting directly on" their "rights … without Article II oversight," ROA.645 n.8. Indeed, by the time the district court entered judgment, plaintiffs still had 17 FOIA requests pending before the CPSC, and it is undisputed that they intend to submit more in the future. ROA.13-14, 508-547, 617. For standing purposes, plaintiffs are therefore nothing like a member of the general public, such as the litigant challenging Justice Black's appointment who had "no interest" in the issue "other than that of a citizen." *Ex parte Levitt*, 302 U.S 633, 636 (1937), *cited in* Br. 25. As entities "regulated by" the CPSC, they are no "mere outsider[s]" under Article III, and they remain free to challenge not just "an agency rule that regulates [their] conduct," but "the legality of the regulating agency itself." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53-54 (D.C. Cir. 2015) (Kavanaugh, J.).

**b.** Turning to traceability, the government insists "there is no reason to believe that plaintiffs' future FOIA requests will be passed on by the Commissioners themselves," as opposed to "lower-ranking staff."

Br. 24. But because the Commissioners control their subordinate staff, the removal problem affects any of the actions taken by the agency. For that reason, the Supreme Court has never suggested that a party seeking prospective relief from an unconstitutional removal restriction must show its interactions with the agency would be with its unlawfully insulated head specifically.

To the contrary, when the "Board inspected the firm" in *Free Enterprise Fund*, 561 U.S. at 487, it did so through its "inspection staff," PCAOB, Release No. 104-2005-082, *Inspection of Beckstead & Watts, LLP* 2 (Sept. 28, 2005), https://bit.ly/3Ddn0WE. To obtain a declaratory judgment, the firm certainly did not have to show that any future inspections would be carried out by the Board members themselves. Likewise, when the "CFPB issued a civil investigative demand" in *Seila Law*, the fact it was signed by a deputy enforcement director did not stop the Court from treating that demand as "issued by former Director Richard Cordray" himself. 140 S. Ct. at 2194-95; *see* Excerpts of Record 271, *CFPB v. Seila Law LLC*, 923 F.3d 980 (9th Cir. 2019) (No. 17-56324) (civil investigative demand).

Indeed, if the government's theory were ever adopted, it would blow a gaping hole through removal jurisprudence. Much of what an agency does is carried out by "lower-ranking" officials rather than agency heads, and the government's position would only encourage unconstitutionally insulated officers to further subdelegate their authority. Those perverse incentives would in turn undermine the Constitution's requirement of "a clear and effective chain of command" in which all of "'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; *the lowest officers*, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Free Enter. Fund*, 561 U.S. at 498 (quoting 1 Annals of Cong. 499 (1789) (J. Madison)) (emphasis added). Article II therefore forbids treating "lower-ranking" government officers as mere "'independent decisionmakers.'" Br. 24-25.

Ultimately, the government's traceability theory is merely a variation on its argument—rightly rejected below—that under *Collins*, plaintiffs must "identify a 'plausible nexus' between the removal restriction" here and "decisions regarding their FOIA requests." ROA.640. As the district court recognized, this Court held in *Cochran* that "*Collins*

46

does not apply to plaintiffs seeking prospective relief" such as the declaratory judgment here. ROA.641. Specifically, *Cochran* explained that "*Collins* does not impact" a claim that "does not seek to 'void' the acts" of a particular official, but rather requests the prospective relief of "an administrative adjudication untainted by separation-of-powers violations." 20 F.4th at 210 n.16. That makes sense. Even if a removal restriction did not affect an agency's *past* conduct, that would not justify permitting the agency to unconstitutionally proceed without presidential oversight in the *future*.

In fact, the government embraced this distinction between prospective and retrospective relief in *Collins* itself. While it urged the Supreme Court not "to unravel a multibillion-dollar contract … that was in no way tainted by any constitutional problem," the government emphasized that this position did "not undercut" the portion of the "judgment awarding a declaration that FHFA's structure violates the Constitution" and that the removal restriction should therefore be severed going forward. U.S. Reply & Resp. Br. 28 & n.*, *Collins*, 141 S. Ct. 1761 (Nos. 19-422, 19-563), 2020 WL 6322317. And that distinction is critical in light of the government's position that a challenger must show

"a causal nexus between a statutory removal restriction and the alleged harm" to obtain retrospective relief. ROA.348. If that view carries the day, it may be "challenging to obtain meaningful retrospective relief for constitutional removability claims," meaning that a suit for prospective "declaratory relief" may become "the only way to provide a meaningful avenue of relief" for parties dealing with an unconstitutionally structured agency. *Cochran*, 20 F.4th at 232-33 (Oldham, J., concurring) (cleaned up). This Court should decline the government's invitation to insulate unconstitutional removal restrictions from any meaningful judicial review on both the front-end and the back-end.

In all events, this case is a poor vehicle for the government's traceability theory. Plaintiffs' pending and future FOIA requests will ultimately be "passed on" by the CPSC's General Counsel—just as their previous ones were—making him the relevant "lower-ranking" officer. Br. 24; *see* 16 C.F.R. § 1015.1(d) (designating the General Counsel as the authority for the Commission's FOIA appeals); *id.* § 1015.7(e) (providing that the General Counsel's decision on a FOIA appeal constitutes "final agency action"); ROA.128-145, 174-181 (Acting General Counsel's ultimate disposition of plaintiffs' previous FOIA requests).

The General Counsel, however, is himself insulated from presidential control. Specifically, he is appointed, and may be removed, by the CPSC Chair with the Commission's approval, 15 U.S.C. § 2053(g)(1)(A), (B)(ii), and this appointment "shall not be subject, directly or indirectly, to review or approval by any officer or entity within the Executive Office of the President," *id.* § 2053(g)(4). In addition, the "[a]ppointment or removal of a person to or from any Senior Executive Service position in an independent regulatory commission"—including the CPSC's General Counsel—"shall not be subject, directly or indirectly, to review or approval by any officer or entity within the Executive Office of the President." 5 U.S.C. § 3392(d); *see* House Comm. on Oversight & Reform, *Policy and Supporting Positions* 151, 116th Cong. 2d Sess. (2020) (Plum Book), https://bit.ly/3UoLBhb.

As the Commissioners, and not the President, control the General Counsel, their lack of accountability taints his every action. Moreover, the General Counsel's removal restriction is invalid on its own terms. He cannot be described as having "limited duties and no policymaking or administrative authority," and thus does not fall within the *Morrison* exception. *Seila Law*, 140 S. Ct. at 2200; *see* 5 U.S.C. § 3132(a)(2)(E)

(defining a "'Senior Executive Service position'" as "any position in an agency" whose holder "exercises important policy-making, policy-determining, or other executive functions"); *Free Enter. Fund*, 561 U.S. at 542 (Breyer, J., dissenting) (raising concern that "SES appointees in independent agencies may be rendered unconstitutional"). Indeed, the CPSC analogizes its General Counsel to the Deputy Attorney General when it comes to FOIA requests, as he both oversees the CPSC's "Chief FOIA Officer" and "reports directly to the Chairman." CPSC, *2022 Chief FOIA Officer Reports* 1, https://bit.ly/3Sl4H6q. So one way or another, it is inevitable that "plaintiffs' future FOIA requests will be passed on by" an officer with an "unconstitutional removal protection[]." Br. 24.

## B.    Partial Final Judgment Was Proper.

Moving on from Article III, the government faults the district court for entering partial final judgment under Rule 54(b) on the theory that plaintiffs' three claims really "constitute one claim for relief." Br. 21. But the government tellingly did "not dispute" that plaintiffs' constitutional claim was "an independent claim" below, and its efforts to backpedal from that position now go nowhere. ROA.647. The government was right the first time to tacitly concede that Count I is a separate claim. *See Seatrain*

*Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 579, 583 n.22 (1980) (rejecting argument, "[r]aised for the first time" on appeal, that there was only a single claim when the government had "proceeded as though" partial final judgment was proper before then).

1.    Rule 54(b) provides that "[w]hen an action presents more than one claim for relief," a district court "may direct entry of a final judgment as to one or more, but fewer than all, claims" if it "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). This Court has yet to settle on an "articulable standard" for determining "'whether more than one claim for relief is before'" it. *Tetra Techs., Inc. v. Cont'l Ins. Co.*, 755 F.3d 222, 230 (5th Cir. 2014); *see* Br. 16-17 (discussing some "factors" and "'rules of thumb'"). Instead, it often finds the best "guidance" in this area to be "previous decisions," *Tetra Techs.*, 755 F.3d at 230— ideally ones "analogous to" the case at hand, *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 741 (5th Cir. 2000).

This Court recently faced this question in *Texas*, where it considered a constitutional challenge seeking declaratory and injunctive relief. There, the district court entered partial final judgment as to Count I, which sought "a declaratory judgment" that the individual mandate

was unconstitutional and inseverable from the remainder of the Affordable Care Act (ACA). 945 F.3d at 373 n.11. The remaining four counts all "depend[ed] on the success" of that claim, which served as "the basis" for the remainder of the plaintiffs' case. Br. 18; *see Texas*, 945 F.3d at 373 n.11; Dkt. 27 at 28-35, *Texas v. United States*, 352 F. Supp. 3d 665, (N.D. Tex. 2018) (No. 18-cv-167), 2018 WL 8262615 (*Texas* Am. Compl.).

The district court rejected the government's argument that the plaintiffs had presented "'only one claim for purposes of Rule 54(b)—that the individual mandate is unconstitutional and that it is not severable from the rest of the ACA'"—and that "'Counts I through V represent merely alternative theories of relief or different forms of remedy.'" *Texas*, 352 F. Supp. 3d at 670. As it explained, the plaintiffs' claims were "related but distinct," even though they all "presuppose[d] the ACA's unconstitutionality." *Id.* at 671.

This Court agreed, evidently unanimously, observing the "final judgment is only partial because it addresses only" Count I and "[t]he district court has not yet ruled on the other counts." *Texas*, 945 F.3d at 373 n.11; *see id.* at 403-23 (King, J., dissenting) (never taking issue with this ruling). And while the Supreme Court vacated this Court's decision

on the ground that the plaintiffs lacked standing, it never called this Court's Rule 54(b) analysis into question. *See California*, 141 S. Ct. at 2115 (discussing the entry of "partial final judgment on count I"). So even if the Rule 54(b) holding in *Texas* is technically "non-binding," that "prior vacated decision" furnishes a "persuasive" guide to determining whether more than one claim for relief is presented here. *Munn v. City of Ocean Springs*, 763 F.3d 437, 441 (5th Cir. 2014); *see Eldredge*, 207 F.3d at 741-42 (finding "analogous" case from the Seventh Circuit "instructive").

That is especially so because in *Texas*, the government *agreed* in its brief to this Court that partial final judgment was appropriate. As that brief explained, "although this Court 'has not announced a single test for determining what is a claim for Rule 54(b) purposes,' claims can be distinct for such purposes if they rely on at least some different facts or assert different causes of action that 'protect different interests.'" U.S. Br. 4, *Texas*, 945 F.3d 355 (No. 19-10011), 2019 WL 2029722 (U.S. *Texas* Br.) (quoting *Johnson v. Ocwen Loan Servicing, LLC*, 916 F.3d 505, 508-509 (5th Cir. 2019)) (cleaned up). In the government's view, the plaintiffs' claims met that test. *Id.* at 4 & n.1. While the government had taken the opposite position in district court because it had believed the complaint

had alleged "only one claim with remedial issues that remain to be resolved," it changed its view in light of the district court's ruling. *Id.* at 4 n.1. Specifically, the court had "foreclosed any further remedial proceedings with respect to" Count I by entering partial final judgment and had "made clear that it regarded the remaining legal claims … as sufficiently separate … as to require separate proceedings." *Id.* at 4 & n.1.

In the Supreme Court, the government took the same position that partial final judgment was appropriate. *See* U.S. Br. 7 & n.2, *California*, 141 S. Ct. 2104 (Nos. 19-840, 19-1019), 2020 WL 3577478. And while it eventually reversed its stance on both the merits and severability questions following the change in administrations, the government never disavowed its Rule 54(b) analysis. *See* Letter from Deputy Solicitor General Edwin S. Kneedler to Clerk Scott S. Harris, *California*, 141 S. Ct. 2104 (Nos. 19-840, 19-1019) (Feb. 10, 2021), https://bit.ly/3L5yq0q.

**2.**     In the present case, partial final judgment was appropriate for the same reasons as in *Texas*. The district court's decision here "foreclosed any further remedial proceedings with respect to" Count I and "made clear that it regarded the remaining legal claims in the complaint as sufficiently separate … as to require separate proceedings." *Texas* U.S.

Br. 4 & n.1; *see Texas*, 945 F.3d at 373 n.11; ROA.646-650. Moreover, plaintiffs' claims in Counts I, II, and III all "rely on at least some different facts" and "assert different causes of action that 'protect different interests.'" *Texas* U.S. Br. 4 (cleaned up). Indeed, each of these claims involves a different injury, a different cause of action, and a different form of relief. ROA.618. And where, as here, "the facts give rise to more than one legal right or cause of action, and the two grounds of recovery are not mutually exclusive, there are multiple claims which can be separately appealed upon certification under Rule 54(b)." *H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 176 (5th Cir. 1988).

Start with injury. While the *Texas* plaintiffs' alleged harms—injuries from the ACA as a whole—were the same across all five counts, *Texas* Am. Compl. 16-33, that is not the case here, making partial final judgment even more appropriate. Rather, plaintiffs' constitutional claim (Count I) concerns the "constitutional injury from the threat of being subject to a regulatory scheme and governmental action lacking Article II oversight." ROA.624; *see* ROA.35-37. Their APA claim (Count II), by contrast, addresses financial harm from increased FOIA fees. ROA.32; *see* ROA.38-39. And their FOIA claim (Count III) rests on a third harm:

informational injury from the withholding of records. ROA.30-31; *see* ROA.39-41. "Because each count involves distinct facts relating to separate injuries, each count is a separate claim for purposes of Rule 54(b)." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 502 (6th Cir. 2012).

The three claims here also "assert different causes of action that 'protect different interests.'" *Texas* U.S. Br. 4 (cleaned up). Count I relies on "an implied private right of action directly under the Constitution to challenge governmental action under separation-of-powers principles." ROA.35 (quoting *Free Enter. Fund*, 561 U.S. at 491 n.2) (cleaned up). Count II, by contrast, rests on a cause of action provided by the APA, which in turn comes with distinct requirements—such as the need to show that the 2021 rule was final agency action. ROA.38. And Count III invokes a third cause of action provided by FOIA, ROA.39, which triggers additional requirements such as administrative exhaustion, ROA.40.

Finally, the three claims here seek "quite different sorts of relief," *Seatrain*, 444 U.S. at 581, which are "'not mutually exclusive,'" *Samaad*, 940 F.2d at 932. Whereas "Count I seeks declaratory relief," a *prospective* remedy, "Counts II and III seek to set aside the Final Rule and the FOIA

determinations," which includes *retrospective* relief. ROA.647. Thus, to prevail on those claims, plaintiffs would need to respond to the argument that under *Collins*, "there is no reason to believe that the existence of the removal restriction" affected the 2021 rule or the challenged FOIA decisions. ROA.349-350. That is why the district court denied the motion to dismiss *in part*, observing that "only" Counts II and III sought "retrospective relief" and that this Court "has yet to clarify the requirements for obtaining retrospective relief post-*Collins*." ROA.642 n.6, 649. Moreover, while the government claimed that the release of the withheld records might dispose of plaintiffs' FOIA claim "without the need to address a disputed constitutional issue," ROA.369, that could not moot their constitutional claim seeking prospective relief. That "each claim requires proof of facts that the other does not" is only further confirmation that "plaintiffs presented separate claims for relief." *Samaad*, 940 F.2d at 932.

**3.**    In response, the government does not even mention this Court's ruling on the Rule 54(b) issue in *Texas*, even though the government agreed with that ruling and the district court relied on it in entering partial final judgment here. ROA.647. Nor does the government

explain why it did "not dispute that Count I is an independent claim" below, thereby tacitly conceding the issue, while its Rule 54(b) theory now serves as its lead argument on appeal. ROA.647. Instead, the government mischaracterizes the district court's final disposition of Count I as the mere resolution of a "'threshold legal issue.'" Br. 21. That argument suffers from multiple independent flaws.

a.    To start, the government's Rule 54(b) theory rises and falls with its flawed premise that plaintiffs lack "standing to seek declaratory relief untethered from any other claim." Br. 23; *see supra* Pt. II.A. If the government is wrong as to the premise, then plaintiffs' constitutional claim seeking a declaratory judgment is by definition "untethered" from the others for Rule 54(b) purposes. Count I cannot be dismissed as a mere "predicate for relief" for plaintiffs' "FOIA-related claims" or "'an interlocutory decision'" if plaintiffs could have pursued "a stand-alone claim for declaratory relief regarding their constitutional contentions" without also raising their FOIA and APA claims. Br. 14-15, 20, 25. So if the government's Article III argument cannot carry the day, its Rule 54(b) theory necessarily cannot either.

The government's lead case here, *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737 (1976), proves the point. *See* Br. 19. There, the plaintiffs "set forth but a single claim"—that the company's "employee insurance benefits and maternity leave regulations discriminated against its women employees in violation of Title VII." 424 U.S. at 743. The district court granted the plaintiffs "partial summary judgment only as to the issue of liability" and entered a partial final judgment. *Id.* at 740-42. The Supreme Court deemed this improper because the plaintiffs had obtained "none of the relief which they expressly prayed for"— namely, an injunction, damages, and attorney's fees. *Id.* at 742. The Court then observed that even if it treated the court's order as "a declaratory judgment on the issue of liability," partial final judgment would still have been improper because that order "finally disposed of none of" plaintiffs' "prayers for relief." *Id.* The Court cautioned, however, that if plaintiffs had "sought only a declaratory judgment and no other form of relief, we would of course have a different case." *Id.*

Here, by contrast, Count I sought a declaratory judgment not merely to create a basis for other remedies, but to provide its own independent relief—*i.e.*, fixing the future constitutional harm of being

regulated by an unconstitutionally structured agency. *See supra* Pt. II.A. As a result, plaintiffs could have sought "only [the] declaratory judgment[] and no other form of relief," *Liberty Mut.*, 424 U.S. at 742, which would have constituted a final judgment appealable under 28 U.S.C. § 1291. That makes *Liberty Mutual* inapposite here. As the Supreme Court has explained, *Liberty Mutual* applies only when a court has "finally disposed of none of" a "plaintiff's prayers for relief," and *not* where, as here, "one of" those "claims for relief was actually decided." *Seatrain* 444 U.S. at 583 n.21. Or, as the government put it in *Texas*, because a declaratory judgment on Count I "foreclosed any further remedial proceedings with respect to that count," it was clear that the plaintiffs had not "allege[d] only one claim with remedial issues that remain to be resolved at subsequent proceedings." *Texas* U.S. Br. 4. n.1.

**b.**   To the extent the government contends that partial final judgment would be inappropriate even if plaintiffs undisputedly had "standing to pursue their constitutional assertion as a stand-alone claim," Br. 21, that argument is even more misguided. The government's efforts to characterize this case as presenting only "one claim for relief" invariably lack merit. Br. 21.

**i.** For example, the government quotes *Liberty Mutual* for the proposition that "'a complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief.'" Br. 19. But this Court has dismissed that language as a "judicial crumb[]" that has "failed to lead the circuit courts to a consensus as to the handling of this confusing area of the law," *Eldredge*, 207 F.3d at 741. While that formulation—like "a single legal theory … applied to only one set of facts"—may describe a suit alleging that a company's "insurance benefits and maternity leave regulations discriminated against its women employees in violation of Title VII," it cannot be stretched to the multi-injury, multi-cause-of-action, multi-remedy case here. *Liberty Mut.*, 424 U.S. at 743; *see supra* Pt. II.B.2.

Indeed, the Supreme Court rejected a similar argument by the government in *Seatrain*. There, the plaintiffs challenged the Secretary of Commerce's decision to exempt their competitor's ship, the Stuyvesant, from a ban on using certain vessels in domestic commerce. 444 U.S. at 574-78. The plaintiffs sought both "a general declaration that the Secretary" lacked authority to exempt "*any* vessel" from this ban and a "particular" declaration that he had abused his discretion in exercising

any such authority as to the Stuyvesant. *Id.* at 580-81. Relying on *Liberty Mutual*, the government claimed partial final judgment was improper on the theory that the plaintiffs had "asserted only one claim or cause of action arising out of one set of facts: that the Secretary could not lawfully permit the Stuyvesant to sail." U.S. Br. 41 & n.44., *Seatrain*, 444 U.S. 572 (No. 78-1651), 1979 WL 200149 (capitalization altered).

The Supreme Court rejected that argument, explaining that even though the plaintiffs' two arguments were "not, of course, unrelated"—in that "a favorable disposition" of the authority argument would leave the plaintiffs "with no reason to press" their abuse-of-discretion argument—there were "two claims made and two quite different sorts of relief sought." 444 U.S. at 581 & n.18. Here too, plaintiffs "seek[] not only relief" with respect to their past FOIA requests and the 2021 rule, "but also a general declaration" that the CPSC, as currently structured, violates Article II by resolving their FOIA requests "under *any* circumstances." *Id.* at 580; *see* 15A Wright & Miller, Fed. Prac. & Proc. Juris. § 3914.7.2 (2d ed. Apr. 2022 update) (*Seatrain* shows a "declaration may establish a suitable basis for judgment" under Rule 54(b) "if it affects broader matters than the more specific matters that remain to be resolved").

**ii.**    For similar reasons, the government's argument that partial final judgment here is barred by "the rule against claim-splitting" is flawed as to both premise and conclusion. Br. 16-17; *see* Br. 20. As to *premise*, no "claim-splitting" would occur here even under the government's proposed test, as "a ruling on one count" in this case would not "necessarily have decided the only issue presented in the other counts." Br. 20. A Count I declaration that the CPSC's removal restriction is unlawful will not automatically entitle plaintiffs to relief on Counts II and III, because there are additional hurdles to show that the 2021 rule and the past FOIA denials must be set aside. *See supra* Pt. II.B.2.

In any event, even if "plaintiffs' claims could not be split between successive suits," Br. 20, the *conclusion* that partial final judgment was improper here would not follow. While the government suggests (Br. 20) this Court applied this claim-splitting test in *Eldredge*, that case merely observed that "at least one circuit," the D.C. Circuit, has adopted the "'rule against splitting claims'" approach. 207 F.3d at 741. This Court should not take that step here. To determine whether a plaintiff has "'split his claim,'" this Court asks whether the "claims arose from the same" "'transaction'" or "'series of connected transactions.'" *Jackson v.*

*USPS*, 799 F.2d 1018, 1020-21 (5th Cir. 1986). But for Rule 54(b) purposes, the Supreme Court has "held that separate claims could arise out of the same transaction." *Eldredge*, F.3d at 741 (citing *Cold Metal Process Co. v. United Eng'g & Foundry Co.*, 351 U.S. 445 (1956)); *see* 10 Wright & Miller, Fed. Prac. & Proc. Civ. § 2657 (4th ed. Apr. 2022 update) (observing that *Cold Metal Process* and *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427 (1956), "repudiate the notion that a separate claim for purposes of Rule 54(b) is one that must … arise from a different occurrence or transaction"). That is reason alone to refrain from applying the test for claim-splitting here.

In all events, even if the government's Rule 54(b) argument somehow had merit, it would at most justify vacatur of the entry of partial final judgment, ROA.651, not the order granting plaintiffs' motion for partial summary judgment as to Count I or partially denying the motion to dismiss, ROA.659-650. Thus, the government's lead argument on appeal would serve only to buy it time before the constitutional defect in the Commission's structure inevitably resurfaces before this Court. This further confirms that the government has little confidence that its position on the merits will ultimately carry the day.

\*                    \*                    \*

Try as it might, the government cannot bury the ongoing constitutional violation here under a heap of distractions. The Commission has been wielding substantial executive power for 50 years without political accountability. Supreme Court precedent confirms that those days must come to an end.

## CONCLUSION

The district court's judgment should be affirmed.

September 30, 2022                Respectfully submitted,

                    */s/ Brett A. Shumate*

J. Benjamin Aguiñaga              Donald F. McGahn II
JONES DAY                         Brett A. Shumate
2727 N. Harwood St.               John M. Gore
Dallas, TX 75201                  Anthony J. Dick
(214) 220-3939                    Brinton Lucas
jbaguinaga@jonesday.com           Joseph P. Falvey
                                  JONES DAY
                                  51 Louisiana Ave., N.W.
                                  Washington, D.C. 20001
                                  (202) 879-3939
                                  bshumate@jonesday.com

*Counsel for Appellees Consumers' Research and By Two, L.P.*

## CERTIFICATE OF SERVICE

I certify that on September 30, 2022, I served a copy of the foregoing

on all counsel of record by CM/ECF.

Dated:  September 30, 2022

/s/ Brett A. Shumate
Brett A. Shumate
*Counsel for Appellees Consumers'
Research and By Two, L.P.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) & (7)(B), and Fifth Circuit Rules 32.1 & 32.2. Excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 12,870 words and was prepared using Microsoft Word and produced in Century Schoolbook Standard 14-point font.

Dated: September 30, 2022

*/s/ Brett A. Shumate*
Brett A. Shumate
*Counsel for Appellees Consumers'*
*Research and By Two, L.P.*